Mark S. and Barbara S. Campbell v. Commissioner.
Campbell v. Commissioner
Docket No. 2452-71.
United States Tax Court
T.C. Memo 1972-94; 1972 Tax Ct. Memo LEXIS 162; 31 T.C.M. (CCH) 371; T.C.M. (RIA) 72094; April 25, 1972, Filed. Mark S. Campbell and Barbara S. Campbell, pro se, 7426 Overdale Drive, Dallas, Texas. Douglas R. Fortney, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1968 in the amount of $1,529.40. The only issue for decision is whether an indebtedness to petitioner Mark S. Campbell in the amount of $11,453.10 which became worthless in the taxable year 1968 was a business or nonbusiness bad debt. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife who resided in Dallas, Texas on the date of the filing of the petition in this case, filed their joint Federal income tax return for the calendar year *163 1968 with the Southwest Service Center. Mark S. Campbell (hereinafter referred to as petitioner) was an employee of Texas Instruments and on his income tax return for 1968 reported the income from the salary he received from his employment. Petitioner was also engaged in the business of oil and gas production. On his return in schedule C, "Profit (or Loss) from Busines or Profession (Sole Proprietorship)," he showed his business to be oil and gas production with receipts and gross profit of $16,052.76. On this schedule C deductions in the total amount of $26,578.38 were listed which included an item of bad debt in the amount of $11,453.10. On schedule C petitioner showed that he owned an interest in 11 oil wells. Included in the wells were Skiviolocke No. 1, Wurthrick No. 1, Stark, Johnson, Mark No. 1, in which petitioner owned a one thirty-second working interest, and the Stark Ceramics No. 1 well in which petitioner owned a one sixty-fourth working interest. These wells were wells which were drilled by S & S Gas and Oil Company in Stark and Columbiana Counties, Ohio. On April 21, 1967, petitioner received from S & S Gas and Oil Company a report of an engineer dated April 14, 1967, with *164 respect to the Skiviolocke No. 1 well, giving a total value to the well of $258,220 for oil and gas. In June 1967 petitioner received from S & S Gas and Oil Company a report with respect to the Wurthrick No. 1 well, showing a total gross recovery value of the well of $405,000. Based on the reports he received in April and June of 1967, petitioner estimated that from his interests in the four wells, he would receive, over the productive life of the wells, net income, after deducting operating expenses, in the total amount of $6,221. Because of the favorable reports he received, petitioner wrote to the S & S Gas and Oil Company and inquired if it would be possible for him to obtain an additional interest in the four wells. He was advised orally by one of the partners of the S & S Gas and Oil Company that all owners were satisfied with their interests and that he knew of no additional interest in any of the four wells that was for sale. An accountant by the name of John P. Hayes who did work for S & S Gas and Oil Company approached petitioner shortly after petitioner had inquired from S & S Gas and Oil Company as to the possibility of obtaining further interests in the four wells *165 in which he already owned interests, and asked petitioner to lend him $12,500. Petitioner had previously met Hayes when he had called at the offices of S & S Gas and Oil Company. Hayes stated that in addition to paying interest of 7 percent on the loan, he would secure the loan with his working interests in the Skiviolocke No. 1, Wurthrick No. 1, Stark, Johnson, Mark No. 1, Stark Ceramics No. 1, and Lincoln Home Sites No. 1 oil wells. Hayes further stated that during the period while the loan was outstanding he would pay all income from his working interests in these wells to petitioner up to a maximum of $2,000 a month to apply against principal and interest on the note and that when the note was paid 372 in full Hayes would transfer to petitioner his one thirty-second interest in Skiviolocke No. 1, Wurthrick No. 1, and Stark, Johnson, Mark No. 1 wells and a one sixty-fourth working interest in the Stark Ceramics No. 1 well. Petitioner agreed to lend $12,500 to Hayes under the conditions proposed by Hayes and on July 25, 1967, petitioner loaned Hayes $12,500 and Hayes executed a promissory note payable to petitioner on or before May 1, 1968, with interest at 7 percent per annum *166 from the date the note was executed until paid. On the same date Hayes, petitioner, and S & S Gas and Oil Company entered into an agreement which recited the working interests which S & S Gas and Oil Company had contracted to convey to Hayes in the five wells, which working interests were being assigned as collateral security for the note given by Hayes to petitioner, and that Hayes agreed to assign a portion of the working interests in four of the wells to petitioner when the note was paid in full. Petitioner estimated that the working interests in the four wells which would be assigned to him by Hayes when the note was paid in full would, on the basis of the engineering reports he had received from S & S Gas and Oil Company result in total net income of $2,621 from the properties over the period of time that he would own the working interests. The engineers' estimates which petitioner received from S & S Gas and Oil Company in April and June of 1967 turned out to be over optimistic. After the first few months, pressure in the wells subsided and the recovery rate dropped rapidly. After a small payment, Hayes defaulted on his note. When the note became due on May 1, 1968, petitioner *167 made several unsuccessful efforts to collect the balance. Petitioner was unable to collect the balance due on the note and had his attorney write the attorney for S & S Gas and Oil Company requesting that the working interests in the wells which had been assigned as collateral security for the note be transferred to petitioner. The attorney for S & S Gas and Oil Company replied to petitioner's attorney stating that there was no reason why an assignment of the interest in these wells which were committed to Hayes could not be made directly from S & S Gas and Oil Company to petitioner if petitioner paid the completion costs of the wells, which payments by Hayes were in default. The letter stated that Hayes owed S & S Gas and Oil Company $4,090.41 as completion costs on the interest which S & S had contracted to convey to him in the various wells. The letter further stated that no assignment of the working interests could be made unless payment was made in full for the completion costs due from Hayes to S & S Gas and Oil Company. Since the wells had failed to produce in accordance with the report of prospective production made by the engineers, petitioner concluded that he would *168 not recover the amount of completion costs he would be required to pay from the income he would obtain from the wells, and therefore did not make the payment and receive an assignment of the working interests in these wells. Petitioner had no other feasible means of collecting the $11,453.10 remaining due on Hayes' note, and Hayes' indebtedness to petitioner to that extent became worthless in 1968. The $11,453.10 bad debt deduction taken by petitioner on schedule C of his return was the worthless debt of Hayes to petitioner. Respondent in his notice of deficiency disallowed the claimed deduction as a business bad debt and determined that the $11,453.10 was a short-term capital loss from a nonbusiness bad debt. On the basis of this determination, respondent recomputed the capital gains and losses as shown on petitioner's return, the result being that petitioner's ordinary income was increased by the amount of $11,453.10 and the capital gain as reported by petitioner was decreased by this amount, resulting in a decrease in the taxable capital gain as reported of $5,726.55. Opinion Petitioner takes the position that there was a "significant motivation" for his lending the $12,500 *169 to Hayes that was related to his trade or business of oil and gas production. Petitioner contends that he should be allowed to deduct the loss on his loan to Hayes as a business bad debt since he was "significantly motivated" in making the loan by the income which he would receive from the interests in oil wells which would be transferred to him when the loan was 373 paid. [1] Petitioner states that whereas he was particularly motivated to make the loan by the interest he would receive, he was also motivated by the prospect of increasing the amount of interest he held in the oil and gas wells. *170 Petitioner argues that the working interests which he would have received when the note would have been paid could be considered as inventories in that they are potential income producers in the oil and gas business just as inventories are in a retail business. Petitioner contends that the loan he made to Hayes is related to his oil and gas business in the same way that the loan made by the taxpayer in J. T. Dorminey, 26 T.C. 940 (1956), to a corporation in which he was a shareholder was related to that taxpayer's produce business. In Dorminey we held that the loan made by the taxpayer to a corporation in which he was a shareholder which was formed to import bananas to this country was made for the purpose of obtaining bananas which the taxpayer needed in his produce business and which were in short supply. Petitioner likewise likens his situation to that present in Wilfred J. Funk, 35 T.C. 42 (1960), in which we held that loans to a publishing business were proximately related to the taxpayer's occupation as a professional writer. In so holding we stated that an important purpose of the taxpayer's loan was to provide him with a ready publishing outlet for *171 his own work and to enhance and exploit his reputation as a writer. Petitioner cites a number of other cases similar in their holdings to the Dorminey and Funk cases. In our view the loan made by petitioner to Hayes was not proximately related to petitioner's oil and gas production business. Petitioner had sought to purchase additional interests in the particular wells which were to be transferred to him when the loan was paid in full, and had been informed that no such interests were presently for sale. However, petitioner has not shown why his oil and gas production business was in any way dependent on acquiring these particular working interests as distinguished from other available working interests. Therefore, petitioner has shown no necessity for the making of the loan to Hayes in order to increase his interests in oil and gas production. Furthermore, an investment in an oil and gas well is not comparable to obtaining inventory which is to be resold but is more comparable to an investment. See Syer v. United States, 380 F. 2d 1009 (C.A. 4, 1967). Finally, it might be pointed out that petitioner at no time contended that the "dominant" motivation for his making *172 the loan to Hayes had a proximate relationship to his business as an oil and gas producer but limited his claim to such a motivation being "significant." While we conclude on the basis of the facts in this case that there was no proximate relationship between petitioner's oil and gas production business and his loan to Hayes, but rather that petitioner was motivated by the 7 percent interest he would receive and the value of the working interests in the oil wells which would be assigned to him as further compensation to him for the use of his money, we would not, in view of the recent decision of the United States Supreme Court in United States v. Generes, - U.S. - (Feb. 23, 1972), decide this case for petitioner even if we concluded that he was correct in the sole contention that a "significant" motivation for his making the loan was proximately related to his business as an oil and gas producer. In the Generes case the Supreme Court held that in determining whether a bad debt has a proximate relationship to a taxpayer's trade or business so as to qualify as a business bad debt, the proper measure is that of "dominant motivation" and that only "significant" motivation is not sufficient. *173 All that petitioner in this case contends is that there was a "significant" motivation in his making the loan to Hayes which was proximately related to his oil and gas producing business. Decision will be entered for respondent. 374 Footnotes
1. Sec. 166, I.R.C. 1954, provides for the deduction of any debt which becomes worthless within the taxable year. However, sec. 166(d) provides the following limitation on the deduction of nonbusiness bad debts: (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩